IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

UNITED STATES OF AMERICA    )
    )    Criminal No. 7:17-cr-56
v.    )
    )
MONTA ORLANDO JORDAN,    )    By:    Michael F. Urbanski
et. al.,    )    Chief United States District Judge
    Defendant.    )

## MEMORANDUM OPINION

This matter is before the court on a pro se motion by defendant Monta Jordan for appointment of new CJA counsel. Motion, ECF No. 350. Jordan's CJA counsel, Louis K. Nagy and A. Gene Hart, Jr., also asked that they be allowed to withdraw from their representation of Jordan. Motion, ECF No. 364. A hearing was held on February 8, 2021, at which time both Jordan and his counsel fully addressed their concerns with the court. For the reasons stated herein and on the record at the hearing, the request for new counsel and to withdraw as counsel are **DENIED**.  The case remains set down for sentencing on March 9, 2021.

## I.

It is clear to the court from the hearing that there has not been a breakdown of communication between Jordan and his CJA counsel preventing the mounting of an adequate defense so as to require appointment of new counsel for Jordan's sentencing hearing.  See United States v. Smith, 640 F.3d 580, 588 n.4 (4th Cir. 2011) ("To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel. . . . Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an

irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant. . .”). After conducting an inquiry, the court finds that the present disagreement does not rise to the level requiring substitution for the purposes of sentencing. Rather, the current disagreement stems from Jordan's lingering concerns over the government's discovery obligations largely surrounding Jordan's claims of police misconduct and his counsel's reluctance, founded on their ethical obligations, to press these issues to Jordan's satisfaction.

As the Fourth Circuit explained in Smith,

> [W]e have been concerned not with the indigent defendant's freedom of choice or with whether the attorney and his client have a "meaningful relationship," Morris v. Slappy, 461 U.S. 1, 14, (1983), but with a "breakdown" of attorney-client communication so great that the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated. In short, the defendant's Sixth Amendment right to successor appointed counsel arises because the initial appointment has ceased to constitute Sixth Amendment assistance of counsel.

640 F.3d at 588. Given (1) the timing of the substitution request and the procedural posture of the case, (2) the court's understanding of the history of this case and the circumstances surrounding Jordan's representation by CJA counsel, (3) the court's ability to observe the effective representation of present CJA counsel in pre-trial, trial, and post-trial proceedings, and (4) the court's appreciation of the present disagreement, the court declines to appoint a fifth CJA counsel for Jordan in this case for sentencing purposes.

At the February 8, 2021 hearing, Jordan addressed the court, raising several issues which continue to concern him about the government's discovery failings in this case. In the court's view, Jordan's concerns over discovery pose no impediment to current CJA counsel from effectively representing Jordan at sentencing. As such, the court advised Jordan that

there was no reason to appoint a fifth CJA counsel to represent him at sentencing. The court advised Jordan that he had the right to represent himself at his sentencing, see United States v. Faretta, 422 U.S. 806 (1975), and that should he desire to do so, the court would appoint current CJA counsel as standby counsel at sentencings, see McKaskle v. Wiggins, 465 U.S. 168, 176 (1984). The court explained to Jordan what is expected to transpire at his sentencing hearing, including addressing objections to the presentence report, calculation of the advisory sentencing guidelines, consideration of the factors under 18 U.S.C. § 3553(a), and his opportunity to allocute. Following discussion, Jordan declined to represent himself and agreed to remain represented by current CJA counsel Nagy and Hart at the sentencing hearing. In reaching its decision not to appoint a fifth CJA counsel in this case, the court finds it to be helpful to place Jordan's request within the broader context of this case.

## II.

Since the outset of this case, Jordan has expressed dissatisfaction with each of his CJA counsel's unwillingness to advance his claims of police misconduct. Two prior CJA counsel have withdrawn, and CJA counsel Nagy and Hart are Jordan's third and fourth court appointed lawyers in this case, respectively.

Jordan's first CJA counsel was David Damico, who represented Jordan from August 14, 2017, until February 2, 2018, when an oral motion was made that new counsel be appointed. As CJA counsel Damico explained at that time, albeit without specificity, he and Jordan had differences on how to proceed, had reached an impasse, and were going in very different directions. Given that discovery had only recently been produced and trial was more than six months off, the court granted the motion to substitute CJA counsel. Robert Rider

was appointed to replace CJA counsel Damico on February 9, 2018.  On October 25, 2018, CJA counsel Rider moved to withdraw as counsel for Jordan, asking the court to appoint new counsel "who may be better qualified and equipped to pursue an  aggressive defense more in line with the theories, recommendations, directions and instructions of the client."  Motion to Withdraw, ECF No. 105, at 2. A hearing was held on the motion to withdraw on November 8, 2018, which, after discussion, was denied at that time. CJA counsel Rider then made an oral motion to appoint additional counsel because of the large volume of digital discovery in this case.   The court agreed, approving the request to appoint additional CJA counsel on November 26, 2018. Order, ECF No. 117. Following an additional hearing on December 18, 2018, to address a conflict issue precluding appointment of a specific CJA counsel requested by Jordan, Louis K. Nagy was appointed as CJA counsel for Jordan on February 8, 2019. ECF No. 127.

On March 12, 2019, Jordan filed a pro se motion seeking issuance of a subpoena to obtain the March 6, 2017 cell phone data of Roanoke City Police Detective Joseph Flippin and DEA Task Force Officers Ryan Sloan and Joseph Crowder, along with photos taken from Jordan's iPhone on March 6, 2017, contending that this data would show that these officers illegally broke into his home on March 6, 2017, in violation of the Fourth Amendment. Motion, ECF No. 135. By order dated March 25, 2019, the court declined to address this pro se request from a party represented by CJA counsel and directed the matter to the attention of Jordan's CJA counsel. Order, ECF No. 137.

On April 18, 2019, CJA counsel Rider again moved to withdraw from his representation of Jordan, this time citing recent health concerns. The court granted CJA

counsel Rider's motion to withdraw, ECF No. 141, and granted CJA counsel Nagy's subsequent request to appoint co-counsel, ECF Nos. 142, 143. A. Gene Hart, Jr., was appointed as Jordan's co-counsel on May 7, 2019. ECF No. 143.

On May 30, 2019, the court docketed under seal a letter from Jordan making allegations of law enforcement misconduct, including the claimed burglary of his home by law enforcement on March 6, 2017, and various improprieties, including sexual improprieties, between law enforcement and government informants.[1] In his letter, Jordan states that he raised these allegations with CJA counsel Damico and Rider, but that, as previously noted, he and CJA counsel Damico "shared a difference of strategies." ECF No 166, at 1. According to Jordan, nor was CJA counsel Rider willing to pursue his allegations. Jordan's letter stated "[t]here is ample evidence at the government's disposal to substantiate my officer misconduct claims, however the incentive to do so apparently is lacking." Id. at 6.

CJA counsel Nagy and Hart doggedly sought discovery on these issues and, in the court's view, pressed them as far as their ethical obligations would allow. Prior to trial, CJA counsel made a number of discovery requests and filed several motions directed to Jordan's concerns. In a Motion for Discovery filed on December 27, 2019, CJA counsel sought specific items identified as being discoverable under Brady v. Maryland, 373 U.S. 83 (1963). Discovery Motion, ECF No. 171. In a Motion for Early Disclosure of Giglio Materials,[2] also filed that

---

[1] A copy of this letter, redacted to protect the identities of confidential informants, was docketed as ECF 166. See Order, ECF No. 161.

[2] The Supreme Court's ruling in Giglio v. United States, 405 U.S. 150 (1972), requires the government to disclose evidence tending to discredit or impeach the credibility of any government witness.

day, CJA counsel expressly sought discovery of evidence of police misconduct. Disclosure

Motion, ECF No. 172. Paragraph 2 of the Disclosure Motion states:

> That throughout the course of this case, the Defendant has made statements and assertions both in filings made by him and on the record indicating that he was in possession of information that would lead him to believe that certain members of the prosecution team, namely; Detective Flippin and Detective Crowder, were involved in behavior prior to and during the course of the investigation of this matter that could potentially be categorized as "outrageous misconduct."

Specifically, the Disclosure Motion asserted that the "outrageous misconduct" "included but

was not limited to the investigators (i) burglarizing the Defendant's home, (ii) carrying on

inappropriate relationships with potential witnesses and/or confidential informants and (iii)

making inappropriate promises or assurances to those witnesses/informants by the

aforementioned officers." Id. at ¶ 5. Defense counsel also filed motions to suppress Title III

wiretap material and GPS tracking data on December 27, 2019. Motions to Suppress, ECF

Nos. 173, 174. A month later, on January 24, 2020, CJA counsel filed an amended Disclosure

Motion and Amended Motions to Suppress. Amended Motions, ECF Nos. 191-193.

The court held a hearing on these motions on February 5, 2020.  The Discovery

Motion, ECF No. 171, was largely resolved as the government had redisclosed to CJA counsel

Nagy and Hart discovery previously provided to former CJA counsel. Thus, as reflected in the

written order docketed on February 6, 2020, the bulk of the Discovery Motion was denied as

moot. Order, ECF No. 213. In the written order, the court also addressed three other items

of discovery requested by Jordan. First, Jordan sought video recordings of certain jail visits,

which the court denied as moot based on the government's representation that the videos did

not exist under the retention policies for the jails in question. Second, Jordan sought law

enforcement interview notes from certain proffer interviews, which the court denied as the government represented that all official reports and extant audio recordings of these proffer sessions had been produced. Nevertheless, the court required the government to go the extra mile, ordering as follows: "However, to the extent that the agents' notes contain underlying exculpatory facts not reflected in the formal reports already produced in discovery, the government is **DIRECTED**, consistent with its existing obligations under Brady v. Maryland, 373 U.S. 83 (1963), to produce those notes to the defense." Order, ECF No. 213, at 3. Third, Jordan sought production of notes taken by former AUSA Ashley Neese during witness interviews.[3] In its order of February 6, 2020, the court stated "[g]iven that the government represents that the recordings and official reports of these proffer interview sessions have been produced, Jordan has not made a sufficient showing to  warrant production of the prosecutor's notes at this time." Id. at 3. Again, however, the court required the government to take an extra step, ordering that "the government is **DIRECTED**, consistent with its existing Brady obligations, to examine the notes of former AUSA Ashley Neese and produce any notes containing 'underlying exculpatory facts' not reflected in the formal investigative reports already produced in discovery." Id. at 4.

At the evidentiary hearing held on February 5, 2020, Jordan called three witnesses in support of his claims of police misconduct.  These witnesses did not support Jordan's claims, as recounted in the written order entered on February 6, 2020. Order, ECF No. 214.

---

[3] AUSA Ashley Neese worked on this case in its early stages. Jordan's claims of misconduct by Neese apparently stem from her involvement in an unrelated case, United States v. Burns, No. 6:13cr0022, 2016 WL 3910273 (W.D. Va. July 14, 2016), in which a new trial was ordered due to the government's failure to timely disclose impeachment evidence.

Nonetheless, the court reminded the government of its continuing obligation to disclose such evidence should it come to light as follows:

> Plainly, documents that support the suspicions that Detectives Crowder and Flippin burglarized Jordan's home; had inappropriate relationships with witnesses or informants in this case; or made inappropriate promises or assurances to witnesses or informants in this case are discoverable under either <u>Brady</u> or <u>Giglio</u> and ought to have been produced in discovery if they exist. Should such information come to light, the government has a continuing obligation to produce it. The government represents that there is no basis for these allegations and that such information does not exist. Further, the testimony presented at the hearing does not support Jordan's allegations. As such, Jordan's motion is **DENIED**.

<u>Id.</u> at 3-4.

Following the evidentiary hearing, the government filed a motion in limine "to preclude the defense from introducing any evidence of alleged misconduct by any officer involved with the investigation of the charges against him," arguing that it was precluded under Federal Rules of Evidence 401 and 403. Motion in Limine, ECF No. 216. In a written order entered on February 12, 2020, the court granted the government's motion to limit Jordan's counsel from making reference in voir dire questions or opening statement to allegations of police misconduct unsupported by evidence. The court also directed counsel to seek leave of court before questioning witnesses on these allegations. Order, ECF No. 224, at 2.  Citing <u>Huddleston v. United States</u>, 485 U.S. 681, 689 (1988), the court reasoned as follows:

> The court finds that no proof has been provided to support the allegations and there is no basis for a reasonable jury to find the fact of "outrageous misconduct" by a preponderance of the evidence.  Jordan's allegations were addressed at length at a February 5, 2020 evidentiary hearing held on Jordan's motions for discovery and disclosure under <u>Giglio</u> of evidence related to these claims. As detailed in the February 6, 2020 Order, Jordan called a number of witnesses at the February 5, 2020 hearing,

> none of whom substantiated his contentions. In short, despite
> being given an opportunity to present evidence to support his
> allegations of wrongdoing, Jordan presented nothing to
> corroborate his claims. As a result, the court **GRANTS** the
> government's motion in limine as follows. Absent introduction
> of evidence supporting Jordan's allegations of officer
> misconduct, Jordan may not make any reference to these claims
> in his voir dire questions or opening statement. At this point,
> there has been no showing that any relevant and admissible
> evidence exists to support these claims. Further, counsel may not
> question any witness on these allegations without first obtaining
> leave of court. The court may revisit this issue during trial should
> circumstances warrant.

Order, ECF No. 224, at 2.

Although Jordan declined to testify at the February 5, 2020 evidentiary hearing, his CJA counsel asked in a motion filed on February 14, 2020, for another opportunity for Jordan to personally "address the Court before trial so that the Court can understand his position and the need for his attorneys to be able to explore certain issues at trial concerning the alleged misconduct of police officers in this case." Motion for Pre-trial Hearing on Government's Motion in Limine, ECF No. 230, at 1-2.

The court revisited this issue in an order entered the day before trial, as follows:

> The court **DENIES** Jordan's eleventh-hour motion for yet
> another pretrial hearing regarding his claims of outrageous
> government misconduct. Motion, ECF No. 230. The court held
> an evidentiary hearing on this subject on February 5, 2020, at
> which time the court heard several witnesses called by Jordan. At
> that hearing, Jordan declined to testify. In two subsequently
> issued orders, ECF Nos. 214 and 224, the court addressed this
> issue and found that no evidence substantiating Jordan's
> allegations of outrageous government misconduct was presented
> at the evidentiary hearing. As such, the court granted the
> government's motion [in limine], precluding defense counsel
> from referencing Jordan's claims of outrageous government
> misconduct in voir dire or opening statement. Order, ECF No.
> 224. The order stated that "[a]t this point, there has been no

showing that any relevant and admissible evidence exists to support these claims. Further, counsel may not question any witness on these allegations without first obtaining leave of court. The court may revisit this issue during the trial should circumstances warrant." Id. at 2.  In other words, should relevant and admissible evidence be presented at trial on Jordan's claims of government misconduct, the court remains open to revisiting this issue.

The trial has been long delayed. As the jury has been summonsed for tomorrow morning, the court **DENIES** Jordan's request for another pretrial evidentiary hearing on this subject. Motion, ECF No. 230. Should Jordan have relevant and admissible evidence to support his claims of government misconduct, he may present it at trial.

Order, ECF No. 245.

Nevertheless, the next morning, before the jury was empaneled, the court allowed Jordan to address the court about his claim that his home was broken into on March 6, 2017, and May 12, 2017, as to which he suspected police involvement. Jordan testified that the pole surveillance camera video footage produced by the government in discovery showed that an unknown white male in a hoodie and jeans was at his home on the morning of March 6, 2017. Jordan testified that "I have no idea who it was." Test. of Monta Jordan, Feb. 18, 2020, ECF No. 250, at 22. Jordan stated that the back door of his house was kicked in on March 6, 2017, and that $15,000 and two watches were taken. Id. at 24. Jordan stated: "Actually, I seen one person in the hoodie and I seen one person in woods and other movement in the woods. I couldn't identify the second person. I can't clearly identify the other person. All I can say is the two people that I did see were white males." Id. at 25.  Although Jordan reiterated that "I don't know who they were,"[4] id. at 26, it was his "personal opinion that it was the police

_____

[4] A few minutes later Jordan was asked again "And you have no idea who it was on your property on March 6, 2017, right?" Jordan answered: "I don't know exactly, no. I don't know." Id. at 29.

because of things leading up to that day." Id. at 24.  After the March 6, 2017 break-in, Jordan installed surveillance cameras at his home. On May 12, 2017, while vacationing in Aruba, Jordan received an alert of motion in his backyard. From his cell phone, Jordan viewed investigating officers Crowder and Flippin removing GPS tracking devices from his BMW and Mercedes and placing one on his Lincoln. Id. at 12. Jordan testified that a few minutes later his home alarm went off and his camera feed cut off. Id. at 13. Jordan called his friend Perry Hash to investigate. Jordan testified that he had no proof that anyone entered his home on May 12, 2017, id. at 29, saw no signs of entry, and was not aware of anything missing. Id. at 21.  Jordan summarized the May 12, 2017 incident as follows: "All I know is they came there to change the GPS devices. They left. They came back six minutes later. Approximately two minutes after that, my home alarm goes off. When my home alarm goes off, Mr. Crowder shouts, 'Turn that stuff off.' And 10 seconds later, all of my cameras went off. That's all I know." Id. at 21.  Apart from Jordan's speculation, there is no evidence that the police broke into Jordan's home on either March 6 or May 12, 2017.  The court gave Jordan multiple opportunities to provide the court with evidence to support his police misconduct claims, but none of his claims were substantiated.[5]

The jury trial proceeded, and Jordan exercised his right not to present any evidence. Following a six-day trial, the jury found Jordan guilty of a drug trafficking conspiracy, possession with the intent to distribute fentanyl, attempted possession with intent to distribute cocaine and heroin, and possession of a firearm in furtherance of a drug trafficking crime. Jury

---

[5] While both Perry Hash and Amany Raya told the DEA that Jordan's house had been burglarized, neither attributed the break-in to law enforcement.

Verdict, ECF No. 264. Jordan moved for a judgment of acquittal and for a new trial, which the court denied by memorandum opinion and order dated June 9, 2020. ECF Nos. 300, 301. Jordan again asked for new counsel, which the court denied on June 29, 2020, stating "Jordan has had multiple counsel in this case, and the court has observed counsel's zealous and constitutionally effective representation of Jordan at trial. It sees no basis to appoint new counsel to represent Jordan during his sentencing." Order, ECF No. 309, at 1.

### III.

Thereafter, an issue arose concerning the government's failure to produce a videorecorded DEA interview of Jordan's confederate, Perry Hash, prior to trial. The court allowed Jordan's counsel to investigate the issue and file a new motion for judgment of acquittal or new trial. The matter was briefed, and the court held a day-long evidentiary hearing on December 1, 2020. Hr'g Tr., ECF No. 373.  At this hearing, DEA Special Agent Charles Sanders, former DEA Task Force Officer Crowder, DEA Task Force Officer Sloan, and Jordan testified. On January 4, 2021, the court granted in part and denied in part the motion for judgment of acquittal, vacating Jordan's conviction on Count Six, charging a violation of 18 U.S.C. § 924(c), because of material exculpatory statements made by Perry Hash during that interview related to the § 924(c) charge. Mem. Op., ECF No. 355, Order, ECF No. 356. As the Perry Hash interview was neither material nor exculpatory as regards Jordan's drug charges, the case was set down for sentencing on the four drug convictions.

### A.

While the focus of the December 1, 2020 hearing was the circumstances surrounding the failure to disclose the Perry Hash interview, Jordan's CJA counsel raised two other

discovery issues at the hearing. The first concerned the failure of the government to disclose prior to trial four attachments to a summary of an interview of Misty Kaufman prepared by ATF Special Agent Brock Newton ("Kaufman Interview Summary"). The four attachments consisted of an Incident Report prepared by DEA Task Force Officer and Case Agent Ryan Sloan; the search warrant for Kaufman's motel room and car; the affidavit supporting the search warrant prepared by Sloan; and narrative notes of the Kaufman interview prepared by Detective Flippin. ECF Nos. 346-1 through 346-5. The Kaufman Interview Summary reflected an interview conducted by law enforcement on December 16, 2016, during a police encounter with Kaufman at a Roanoke motel. The second discovery issue concerned the post-trial disclosure, at defense counsel's request, of DEA administrative subpoenas seeking data on cellphone numbers associated with Jordan.

The Kaufman Interview Summary spanned two pages and covered a number of topics. One paragraph mentioned Jordan, as follows:

> KAUFMAN stated that approximately six months ago she started purchasing methamphetamine and heroin from Montay "Tay" JORDAN, who she positively identified through a photograph. KAUFMAN stated over the past six months she had been selling approximately five (5) to ten (10) grams of heroin per week and at least (14) grams of methamphetamine per week, which was purchased from JORDAN.

Kaufman Interview Summary, ECF No. 386-1, at 2.[6]  The government represented that the Kaufman Interview Summary was produced to the defense in 2018 and again in 2020. Dec. 1,

---

[6]Consistent with the Kaufman Interview Summary, the narrative notes of Detective Flippin state that Kaufman positively identified Jordan from a photo and that she bought dope from him. Flippin Narrative Notes, ECF No. 346-1, at 1-2.

2020, Hr'g Tr., ECF No. 373, at 158. As regards the attachments to the Kaufman Interview

Summary, AUSA Kari Munro explained:

> So the attachments that the ATF maintained in its investigative
> file have no relationship to the Jordan prosecution at all. So the
> only thing that was obtained and produced by the government
> from ATF was the report that actually mentions Mr. Jordan,
> because there's nothing else about the case against Misty
> Kaufman that relates to him, other than her own statements that
> Mr. Jordan was one of her suppliers.

Id. at 159.

Jordan's principal issue with the government's failure to disclose the attachments to

the Kaufman Interview Summary prior to trial was with the Sloan Incident Report addressing

the same December 16, 2016 law enforcement encounter with Kaufman at her motel. What

interested Jordan's CJA counsel was the fact that the Sloan Incident Report, unlike the

disclosed Kaufman Interview Summary and Flippin's narrative notes, made no mention of

Jordan, raising questions about the veracity of the statements about Jordan in the Kaufman

Interview Summary.

CJA counsel Nagy questioned Sloan why his report of the same encounter with

Kaufman did not mention Jordan. In response to CJA counsel Nagy's questions, Sloan

explained that he was tasked with obtaining the state search warrant for the subject motel

room and did not question Kaufman. Sloan testified:

> I left – once we saw the residue and the gun in plain sight, I wrote
> the search warrant while a post-Miranda interview was conducted
> on Ms. Kaufman. I was not part of the interview; I didn't ask her
> any questions. I sat 20 feet away, knocked out a state search
> warrant, went down to the magistrate's office, was gone about an
> hour and got back, and the interview was, I guess, concluded or
> still going on while we searched the hotel room.

Id. at 145.  Following inquiry from the court, CJA counsel Nagy explained that while the

Kaufman Interview summary recounts that Kaufman identified Jordan as being one of her

drug suppliers, the "case agent's report" makes no "mention of Monta Jordan." Id. at 148.

CJA counsel Nagy stated:

> I will say this: I was – we are now, what, nine months after the
> trial and I'm still asking for documentation and I'm still getting
> documentation. And the problem with this, when I got it, I mean,
> when this is turned over to me, is I've got two police officers
> saying X, Y, Z, and Z is focused on Monta Jordan. And then I
> get the case agent's report as part of this supplement and there is
> not a mention of Monta Jordan.
>
> Now, I don't know if I would consider that necessarily Jencks[7]
> or Brady. But if I had gotten that before and looked at that, it
> would have raised some eyebrows. And I think the Court would
> agree that that is problematic. I'm looking at this and I'm saying,
> okay, well, I've got two guys that are claiming she made a
> statement that day, and then I've got the case agent who – it's just
> vacant. There's no mention of Monta Jordan when the other two
> do.
>
> And so part of the reason I'm asking the questions that I'm asking
> is that, on its face, when I'm looking at these three reports, it
> looks like we've got a situation where the nondisclosure of his
> supplement and Investigator Flippin's supplement could
> potentially be exculpatory in some manner. I mean, we're fleshing
> it out at this point.

Id. at 147-148.

When asked by the court whether CJA counsel believed that the attachments to the

Kaufman Interview Summary, not produced before Jordan's trial, were material or

exculpatory, CJA counsel Nagy answered:

---

[7] The Supreme Court's ruling in Jencks v. United States, 353 U.S. 657 (1957), requires the government to produce, for impeachment purposes, prior statements made to government agents by government witnesses. Kaufman was not a government witness in this case.

> And, again, I think that the way to resolve it at this point is to say as follows: I did not understand what I was looking at, and it looked to me, when I initially got these, like what we had was a report from an officer that was substantially different from a report given by two other officers. And what's more is that the different report is from a case agent.
>
> Now, again, Sloan has clarified that today and indicated that he was not there, and that would explain the absence. And so, therefore, based on his under-oath testimony today, I want the Court to understand that I do not – I do not believe that I am in a position to say that this was exculpatory. But I want the Court to understand why I'm asking the questions, because from my perspective, I don't know.

Id. at 149.

A few weeks later, in a subsequently filed pleading styled Response to Court's Inquiry Regarding Exculpatory Materials, ECF No. 346, CJA counsel advised the court that he did not believe there was any basis to assert a Brady claim based on the post-trial production, at CJA counsel's request, of "several administrative subpoenas which had been issued at the request of T.F.O. Sloan and several attachments/reports which were referenced in a previously disclosed report surrounding an investigation of Misty Kauffman." Id. at 1.  Counsel stated:

> 6.     Upon further review of the materials provided by the Government and specifically in light of T.F.O. Sloane's **under oath testimony** at the December 1, 2020 hearing, counsel does hereby assert that the aforementioned materials do not appear to be "Brady" materials and is not asserting that such materials should be considered by this Court as evidence of or for the purpose of establishing any alleged "Brady violation" by the Government.

Id. at 2 (emphasis in original).

The court's review of the attachments to the Kaufman Interview Summary confirms that these materials contain nothing exculpatory regarding Jordan. As noted earlier, consistent

with the Kaufman Interview Summary that was produced in discovery prior to trial, ECF No. 386-1, Flippin's narrative notes recount that Kaufman identified Jordan from a photo as selling dope to her. Flippin Narrative Notes, ECF No. 346-1, at 1-2.  As Sloan testified, he was working on obtaining the state search warrant for Kaufman's motel room and car and did not conduct her interview. Accordingly, Sloan's Incident Report makes no mention of Kaufman's identification of Jordan as one of her drug suppliers. <u>See</u> Incident Report and Confidential Supplement, ECF No. 346-1, at 3-13. Consistently, nothing in Sloan's affidavit supporting the search warrant for Kaufman's motel room and car mentions Jordan.  Search Warrant Affidavit, ECF No. 386-2, at 3-4. Nor is there anything exculpatory in the DEA subpoenas issued to Verizon Wireless concerning various cell phone numbers. Rather, the documents state that the "[p]hone numbers alleged to belong to Monte JORDAN a kilogram supplier of cocaine, heroin and possibly methamphetamine in Roanoke, VA." ECF 346-5, at 1. <u>See</u> ECF 346-4 ("Phone belonging to Monta JORDAN a polydrug kilogram supplier in Roanoke, VA. This phone is in contact with numerous other kilogram suppliers in Roanoke, VA.").

The attachments to the Kaufman Interview Summary produced to defense counsel after trial contain multiple redactions, which Jordan also questioned. The government explained that the redactions in the Kaufman materials reflected law enforcement sensitive information "that has nothing to do with Monta Jordan." <u>Id.</u> at 156. AUSA Munro explained further:

> Misty Kaufman was arrested in 2016 in connection with that separate ATF case, and during a post-Miranda interview, she made inculpatory statements about Mr. Jordan and others. And so the government obtained a copy of that interview report from ATF and produced it in discovery so that the defense would have a record of the statements that Misty Kaufman had made.

Ms. Kaufman never testified in grand jury. She was not a government witness. We never contemplated that she would be a government witness. But the report was produced, nonetheless, because it referenced Mr. Jordan, and it was produced in an unredacted format.

The report that was produced is the official report of ATF Special Agent Brock Newton for that interview of Misty Kaufman. The attachments that Mr. Nagy was referencing are solely investigative material that pertain to that unrelated case involving Misty Kaufman and others that have no association with Mr. Jordan, the one that remains pending. And those attachments include the police report that Your Honor is looking at right now, they include an unofficial set of notes by Detective Flippin that were used by Special Agent Newton to make the formal official report that the government provided in discovery, and the other attachment is the state search warrant that Detective Sloan just referenced a few moments ago that he obtained. But that warrant was for the hotel room in which Ms. Kaufman was apprehended. The affidavit doesn't mention Mr. Jordan. It has nothing to do with this case.

So while we wanted to produce that information to Mr. Nagy in response to his letter, we did so in consultation with the DEA General Counsel's Office and with the ATF, and we obtained permission from them to provide these materials so Mr. Nagy could ascertain that all of the averments in Ms. Neese's affidavit were accurate.

And the redacted information, Your Honor, is stuff that is investigative information pertaining to that pending ATF case. There's no reference to Mr. Jordan or Mr. Jordan's drug operation behind those redactions, nor was there a reference to it in the affidavit for the search warrant in that case.

And the government, obviously, reviewed all this information to determine whether there's anything exculpatory in there. But Ms. Kaufman made inculpatory statements about Jordan at the time of her arrest in 2016. And, again, that is the official report that the defense has had since 2018.

Id. at 156-158.

In sum, after conducting an evidentiary hearing, considering CJA counsel's position that neither the attachments to the Kaufman Interview Summary nor the DEA administrative subpoenas raise <u>Brady</u> violations, and reviewing the documents in question, the court agrees that delayed production of these materials is not of constitutional dimension undermining the verdict of the jury in this case.

## B.

Over the advice of his counsel, Jordan chose to testify at the December 1, 2020 hearing, and returned again to his claim that law enforcement broke in his house, claiming this time that DEA Task Force Officer Sloan walked through Jordan's house with him on March 3, 2017, under the guise of cleaning his gutters. <u>Id.</u> at 201-204. Jordan added that he was suspicious of a police search, rather than a criminal break-in, on March 6, 2017, because a common criminal would not break into a home with cars in the driveway. Jordan also suspected the police were behind the March 6, 2017 burglary because his room "was searched methodically, but it was searched in a way where it appeared to be a break-in."  <u>Id.</u> at 206. Jordan also questioned why his living room appeared untouched and noted that a dark colored truck was observed half of a block down the street that morning. <u>Id.</u> at 207. For these reasons, while Jordan could not identify the person who broke into his home on March 6, 2017, "he knew it was law enforcement." <u>Id.</u> at 226.

The court questioned CJA counsel Nagy about whether Jordan's revelation that Task Force Office Sloan entered his home on March 3, 2017, posed as a gutter cleaner was new to him. CJA counsel Nagy responded:

> Judge, there is a reason that counsel does not file everything that
> his client wants him to file. And I would tell the Court that – and

> I actually appreciate that Mr. Jordan said this. He seems to appreciate, at a minimum, that I have certain ethical obligations that he doesn't have and that the police don't have and nobody else has. And my job is exceedingly difficult where I'm trying to defend this gentleman with every fiber of my being in a very, very difficult case to defend. And the steps that I have taken to do so I have done so in good faith, when I felt like I had sufficient legal backing and sufficient factual backing to do so. And I appreciate that Mr. Jordan appreciates that. But I can't, I don't think, and when I was taught as an attorney, I don't think I can just come up and start throwing out unsubstantiated motions and unsubstantiated – that is not the way it is done.

Id. at 232-233. As noted at the December 1, 2020 hearing, the court appreciates CJA counsels' adherence to their ethical obligations.

## C.

During the December 2020 and January 2021 period, Jordan wrote several letters to the court, seeking, among other things, new counsel. See Jordan's pro se motions and letters, ECF Nos. 349, 350, 351, 352, 360, 362, 366, and 380.  On January 13, 2021, CJA counsel Nagy and Hart petitioned to withdraw from representing Jordan. See ECF No. 364. The court set a hearing for February 8, 2021.

At the February 8, 2021 hearing, Jordan reiterated his concerns about four aspects of the government's handling of this case: (1) the alleged break-in of his home on March 6, 2017; (2) disclosure of the complete DEA interview of his then girlfriend Amany Raya on August 10, 2017; (3) post-trial disclosure of the attachments to the Kaufman Interview Summary; and (4) post-trial disclosure of the DEA administrative subpoenas.

Following receipt of Jordan's pro se letter dated January 22, 2021, ECF No. 380, the court directed the government to produce to the court the recording of the DEA interview of Amany Raya on August 10, 2017, referenced in Jordan's letter. Order, ECF No. 382. The court

reviewed the audio recording of the Amany Raya DEA interview prior to the February 8, 2021 hearing.

Jordan claims that both the Hash interview and the Raya interview substantiate his claim that the police broke into his home on March 6, 2017, in violation of the Fourth Amendment. The court disagrees. While both Hash and Raya mention that Jordan's house had been burglarized, as was the case with Jordan himself, neither Hash nor Raya knew who the perpetrators were nor identified the police as committing the burglary. Based on the record before the court, Jordan's claim that the police broke into his home is entirely speculative.

At the hearing on February 8, 2021, the government confirmed that the audio recording of the DEA interview with Amany Raya had been produced in discovery prior to the trial of this case. As such, there is no Brady issue concerning the audio recording of the Amany Raya August 10, 2017 DEA interview. Nevertheless, Jordan personally expressed skepticism concerning the government's pretrial production of the entire Amany Raya audio recording, questioning whether a video recording of this interview exists and whether the government provided the complete interview. At the court's request, the government responded to Jordan's inquiries regarding the Amany Raya interview, confirming in writing that "the audio recording of the Raya Interview was provided to defense counsel in discovery in advance of Jordan's February 18, 2020 trial." Response to Court Order, ECF No. 389, at 1. The government also stated that '[t]he audio recording provided to the court (and to the defense in pretrial discovery) constitutes the entire Amany Raya interview and there was no video recording made." Id. at 2.

## IV.

In summary, although Jordan and his counsel have disagreed on discovery strategy, there is no reason to appoint a fifth CJA counsel to represent Jordan at sentencing. When provided with the option of representing himself at sentencing with standby counsel, Jordan declined.

The court has fully addressed Jordan's concerns regarding police misconduct by conducting an evidentiary hearing on his claims, reminding the government of its constitutional obligation to produce such information if it existed, and hearing from both Jordan and his counsel on these issues.

Neither the Perry Hash videotaped interview nor the Amany Raya audiotaped interview substantiate Jordan's claims of police misconduct. To be sure, both Hash and Raya mention that Jordan's house had been burglarized, but neither suggested that the police were responsible. Jordan himself told the court that he does not know the identity of the white man in jeans and a hoodie who broke into his house on March 6, 2017, and stated that there were no signs of entry or anything missing from his home on May 12, 2017, while the police were changing out the GPS location devices on his vehicles. Jordan's "personal opinion" that his home was broken into by police in violation of the Fourth Amendment remains unsubstantiated.

Nor did the witnesses called by Jordan at the February 5, 2020 evidentiary hearing support his claims that the police had engaged in sexual or other improprieties with confidential informants or witnesses.

Further, while an audio recording of the August 10, 2017 DEA interview of Amany Raya was provided to his counsel prior to trial, Jordan questions its completeness. The government has responded that no video recording of the Raya DEA interview was made, and the complete audio recording was produced to defense counsel in pretrial discovery and to the court more recently.

Further, after review of the transcript of the December 1, 2020 hearing, ECF No. 373, CJA counsel's December 22, 2020 Response to the Court's Inquiry Regarding Exculpatory Materials, ECF No. 346, the attachments to the Kaufman Interview Summary and DEA administrative subpoenas appended thereto, ECF Nos. 346-1 through 346-5, and consideration of the evidence and argument at the February 8, 2021 hearing, the court finds no Brady violation regarding these materials as they are not exculpatory.

In sum, despite counsel's substantial efforts to investigate Jordan's concerns and present them to the court, there is nothing on the record of this case to support Jordan's conjecture that his prosecution has been fraught with police misconduct. Nor is there any basis at this point to substitute CJA counsel for sentencing purposes.

An appropriate order will be entered.

Enter: This 25th day of February, 2021

Michael F. Urbanski
Chief U.S. District Judge
2021.02.25 13:14:50 -05'00'

Michael F. Urbanski
Chief United States District Judge