CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
May 09, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No. 7:17-cr-00056 |
| | ) |
| v. | ) |
| | ) |
| | ) |
| MONTA JORDAN, | ) By: Michael F. Urbanski |
| | ) Senior United States District Judge |
| Petitioner | ) |

## MEMORANDUM OPINION

Pending before the court are Monta Jordan's petition for relief filed pursuant to 28 U.S.C. § 2255. ECF No. 474, the government's motion to dismiss the petition, ECF No. 486, and Jordan's response, ECF No. 497. Also pending are Jordan's motion for an evidentiary hearing, ECF No. 496, his motion for leave to file an amended motion for discovery, ECF No. 500, and his second motion for leave to file a motion to expand the record. ECF No. 501. For the reasons discussed below, the court **GRANTS** the government's motion to dismiss and **DISMISSES** Jordan's petition. In addition, the court **DENIES** Jordan's motion for an evidentiary hearing, his motion for leave to file an amended motion for discovery, and his second motion to expand the record.

## I.

On January 2, 2020, Jordan was charged in a third superseding indictment with the following offenses: Between summer 2016 and continuing to on or about March 14, 2018, conspiring to possess with intent to distribute and to distribute 1000 grams or more of heroin, 400 grams or more of fentanyl, 500 grams of methamphetamine, and 500 grams of cocaine,

in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(a), and (b)(1)(B) (Count One); on or about August 1, 2017, attempting to possess with intent to distribute a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Two); on or about August 5, 2017, as a principal and as an aider and abettor, possessing with intent to distribute 400 grams or more of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vi) (Count Three); on or about August 10, 2017, attempting to possess with intent to distribute a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count Four); on or about August 10, 2017, possessing with intent to distribute 100 grams or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (Count Five); on or about July 12, 2017, as a principal and as an aider and abettor, possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. §§ 924(c) and 2 (Count Six); and on or about July 12, 2017, as a principal and as an aider and abettor, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, possessing a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 2 (Count Seven). Third Superseding Indictment, ECF No. 175.

On February 13, 2020, the government moved to dismiss without prejudice Counts Two and Seven of the Third Superseding Indictment and the court granted the motion. ECF Nos. 225, 237. On February 25, 2020, following a six-day jury trial, Jordan was found guilty on Counts One, Three, Four, Five, and Six. Jury Verdict, ECF No. 264. On March 25, 2020, Jordan filed a motion for judgment of acquittal or alternatively for a new trial, to which the government responded. ECF Nos. 270, 283. On June 9, 2020, the court denied the motion. ECF Nos. 300, 301. On August 10, 2020, Jordan filed a second motion for new trial or judgment of acquittal to which the government responded and Jordan replied. ECF Nos. 319,

329, 337. The court held a hearing on the motion on December 1, 2020, and on January 4, 2021, the court granted the motion in part by dismissing Jordan's conviction on Count Six of the third superseding indictment. ECF Nos. 355, 356.

The United States Probation Office prepared and filed a Third Revised Presentence Investigation Report (PSR). ECF No. 399. Jordan had a base offense level of 36 based on drug weight, increased by 4 points for his role in the offense, and by 2 points for obstruction of justice, for a total offense level of 42. Id. ¶¶ 54–69. The offense level of 42 together with his criminal history category of V gave him a guidelines sentencing range of 360 months to life. Id. ¶¶ 104, 130. Counts One and Three carried statutory penalties of 15 years to life; Count Four carried a maximum penalty of 20 years; and Count Five carried a penalty of 10 years to life. Id. ¶ 129. On March 11, 2021, the court sentenced Jordan to concurrent terms of 240 months on each count, to be followed by a 10-year term of supervised release. J., ECF No. 405 at 3. The court explained that it varied downward from the guidelines sentence because of Jordan's age (45 years old at the time of sentencing) and the fact that he had had a heart attack. Sent. Hr'g Tr., ECF No. 414 at 209–211.

Jordan filed a notice of appeal on March 18, 2021, ECF No. 407, and the Fourth Circuit affirmed the conviction in a per curiam opinion on February 2, 2023. ECF Nos. 465, 466. Jordan sought a writ of certiorari from the United States Supreme Court, which was denied on April 25, 2023. ECF Nos. 470, 471.

Jordan filed this 28 U.S.C. § 2255 motion to vacate on October 30, 2023, ECF No. 474, and makes the following arguments:

(1) Appellate counsel provided ineffective assistance when he failed to make specific arguments that Jordan asked him to make;

3

(2) Trial counsel was ineffective for failing to request a <u>Franks</u> hearing based on alleged deliberate falsehoods and statements made with reckless disregard for the truth by law enforcement officers when obtaining warrants;

(3) Trial counsel was ineffective for failing to argue that the monitoring of GPS devices on Jordan's cars when they traveled outside the Commonwealth of Virginia was done in bad faith;

(4) Trial counsel was ineffective for failing to argue that Jordan was a victim of vindictive prosecution;

(5) The government engaged in misconduct when one of its prosecutors told Jordan's counsel that Jordan's girlfriend was going to be indicted in the conspiracy, which was untrue, and the false information caused his counsel to forgo a challenge to an affidavit used to obtain a search warrant;

(6) The government engaged in misconduct when the prosecutor told defense counsel that a witness Jordan had subpoenaed could not attend an evidentiary hearing because he was on military deployment when the truth was that although the witness was out of the country, the government did not know where he was or what he was doing;

(7) The government engaged in vindictive prosecution when it charged Jordan in Count Six of the third superseding indictment with a firearm offense in violation of 18 U.S.C. §§ 924(c) and 2;

(8) Investigators unlawfully monitored Jordan's vehicle when he traveled outside the Commonwealth of Virginia;

(9) The agent who sought a Drug Enforcement Agency ("DEA") administrative subpoena did so unlawfully and testified falsely about the validity of the subpoena; and

(10) Investigators wrongfully deleted text messages from the downloaded contents of one of Jordan's codefendants which demonstrated that Jordan believed police burglarized his home on March 6, 2017.

## II.

### A. 28 U.S.C. § 2255

To state a viable claim for relief under § 2255, a petitioner must prove: (1) that his sentence was "imposed in violation of the Constitution or laws of the United States;" (2) that

"the court was without jurisdiction to impose such a sentence;" or (3) that "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A petitioner collaterally attacking his conviction or sentence via a § 2255 petition bears the burden of showing by a preponderance of evidence that he is entitled to relief. White v. United States, 352 F.Supp.2d 684, 687 (E.D. Va. 2004) (citing Miller v. United States, 261 F.2d 546 (4th Cir. 1958), and Vanater v. Boles, 377 F.2d 898, 900 (4th Cir. 1967)). "The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions, or the [§ 2255 Rules], may be applied to" § 2255 proceedings. Rules Governing Section 2255 Proceedings, Rule 12. The court may dismiss a § 2255 motion without a hearing when the motion, any attached exhibits, and the record of prior proceedings conclusively show that the moving party is not entitled to relief. United States v. Renrick, No. 6:11-CR-00338-JMC-16, 2019 WL 4140934, at *2 (D.S.C. Aug. 30, 2019) (citing 28 U.S.C. § 2255(b)).

"When the district court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment." United States v. Poindexter, 492 F.3d 263, 267 (4th Cir. 2007). The court does not weigh the evidence but reviews the facts in the light most favorable to the petitioner and determines whether there is a genuine issue of fact. Lewis v. United States, No. 4:12-CR-00068-FL-2, 2015 WL 2401514, at *3 (E.D.N.C. May 20, 2015) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "Permissible inferences must still be within the range of reasonable probability, ... and it is the duty of the court to [grant summary judgment] when the necessary inference is so

tenuous that it rests merely upon speculation and conjecture." Id. (citing Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted)).

## B. Ineffective Assistance of Counsel

Criminal defendants have a Sixth Amendment right to effective legal assistance. Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish that counsel's assistance was not reasonably effective, a defendant must satisfy a two-prong analysis: he must show both that counsel's performance fell below an objective standard of reasonableness and that he was prejudiced by counsel's alleged deficient performance. Strickland, 466 U.S. at 669.

When considering the reasonableness prong of Strickland, courts apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also Gray v. Branker, 529 F.3d 220, 228–29 (4th Cir. 2008) (quoting Strickland, 466 U.S. at 688) ("The performance of counsel is measured in terms of 'reasonableness under prevailing professional norms.'") The court must judge counsel "on the facts of the particular case," and assess counsel's performance "from counsel's perspective at the time." Strickland, 466 U.S. at 689. "The performance prong is satisfied when counsel provides reasonably effective assistance, including demonstrating legal competence, doing relevant research, and raising important issues." United States v. Carthorne, 878 F.3d 458, 465 (4th Cir. 2017) (citing Strickland, 466 U.S. at 687–90).

To satisfy the prejudice prong of Strickland, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

6

A court need not address the performance standard before addressing the prejudice standard. Strickland, 466 U.S. at 697. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Regarding claims of ineffective assistance of counsel on appeal, courts typically find ineffective assistance only when "ignored issues are clearly stronger than those presented." Smith v. Robbins, 528 U.S. 259, 288 (2000) (internal citations and quotation omitted). Moreover, appellate counsel is not required to assert all non-frivolous issues on appeal. Griffin v. Aiken, 775 F.3d 1226, 1235 (4th Cir. 1985). Rather, effective appellate advocates weed out weaker arguments to focus on more promising ones. Smith v. Murray, 477 U.S. 527, 536 (1986). A decision made by an attorney with respect to an appeal is entitled to the same presumption that protects sound trial strategy. Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). The petitioner also bears the burden of showing prejudice, which in the context of an appeal, means that he must show a reasonable probability that but for his counsel's unreasonable decision, he would have prevailed on his appeal. Robbins, 528 U.S. at 185.

Two affidavits in this case form the basis of two of Jordan's ineffective assistance of counsel claims and one of his standalone claims. The affidavits were submitted by Detective J.B. Flippin to a magistrate in support of two applications for warrants to attach GPS tracking devices to two of Jordan's vehicles ("GPS search warrants"). Because the affidavits are referred to frequently in the pleadings and in this opinion, they are set forth in relevant part here:

> For several months, Detective Flippin and members of the Roanoke Valley Regional Drug Unit has been investigating

7

> Monta Orlando JORDAN in regards to the distribution of heroin, cocaine, and methamphetamine in the Roanoke Valley. During this investigation Amany Mohamed RAYA has been identified to be the current and longtime girlfriend of JORDAN.
>
> As of 1/31/2017 your affiant located a 2016 Mercedes Benz GLE SUV, white in color .... Amany Mohamed RAYA has been observed driving the aforementioned 2016 Mercedes Benz GLE within the past 15 days. This vehicle has been observed parked in the area of Amany RAYA's known employer. The registration returns to Monta Orlando JORDAN at [address]. Amany RAYA is a suspected distributor of the cocaine, methamphetamine, and heroin which is believed to be being provided by ... Monta Orlando JORDAN.
>
> Your affiant has observed Amany Mohamed RAYA operating the aforementioned 2016 Mercedes Benz GLE sedan ... as early as January 20, 2017. Your affiant believes that both [JORDAN and RAYA] are both operating this vehicle and believed to be distributing narcotics and collecting drug proceeds throughout the Commonwealth of Virginia and outside of Virginia. Your affiant knows it to be common for individuals that distribute narcotics to drive multiple vehicles to distribute narcotics/collect drug proceeds to attempt to not alert police detection.

Affidavit regarding 2016 Mercedes Benz, dated Feb. 8, 2017, ECF No. 474-1 at 31–35. A

second affidavit was filed the next week and contained the following relevant language:

> For several months, Detective Flippin and members of the Roanoke Valley Regional Drug Unit has been investigating Monta Orlando JORDAN in regards to the distribution of heroin, cocaine, and methamphetamine in the Roanoke Valley. During this investigation Amany Mohamed RAYA has been identified to be the current and longtime girlfriend of JORDAN.
>
> Information has been obtained throughout this investigation from interviews/post Miranda interviews that Amany RAYA is the suspected distributor of the cocaine, methamphetamine, heroin which is believed to be being provided by long-term boyfriend Monta Orlando JORDAN. RAYA and JORDAN have both, on several occasions have been observed operating a White 2013 BMW 723 sedan ... . The registration returns to Monta Orlando JORDAN at [address].

8

> Your affiant has observed both Monta Orlando JORDAN and
> Amany Mohamed RAYA operating the aforementioned White
> 2013 BMW sedan .... Your affiant believes that both [JORDAN
> and RAYA] are both operating this vehicle and believed to be
> distributing narcotics and collecting drug proceeds throughout
> the Commonwealth of Virginia and outside the Commonwealth
> of Virginia. Your affiant knows it to be common for individuals
> that distribute narcotics to drive multiple vehicles to distribute
> narcotics/collect drug proceeds to attempt to not alert police
> detection.

Affidavit regarding 2013 BMW sedan, dated February 15, 2017, ECF No. 474-1 at 36–39.

## 1. Ineffective Assistance of Appellate Counsel

Prior to trial, Jordan's trial counsel, Louis Nagy, filed a motion to suppress the evidence

obtained from the GPS trackers that were placed on Jordan's vehicles following approval of

the GPS search warrants. Am. Mot., ECF No. 193.[1] Nagy argued that the affidavits used to

obtain the search warrants that allowed law enforcement to attach tracking devices to Jordan's

vehicles were wholly lacking in probable cause. Rather than containing factual allegations,

Nagy alleged that the affidavits contained only allegations that Jordan was under investigation

for narcotics trafficking, had been seen (or his girlfriend had been seen) driving the car, and

that the affiant, Flippin, suspected Jordan of trafficking narcotics. Am. Mot., ECF No. 193.

The government responded that even if it were assumed that the affidavits were insufficient,

Flippin had an objectively reasonable belief that there was probable cause to execute the GPS

search warrants and that any evidence obtained as a result of the issuance of the warrants

---

[1] Jordan initially was represented in pre-trial matters by David Damico. At Jordan's request, Damico withdrew and was replaced by another attorney, Robert Rider. ECF Nos. 65, 66, 67. Attorney Louis Nagy was appointed to assist Rider. ECF No. 127. Rider filed motions to withdraw from the case, ECF Nos. 105, 140, and the motions were granted. ECF No. 141. Gene Hart was added as counsel to assist Nagy, ECF No. 143, and the two attorneys represented Jordan at trial. On appeal, the Fourth Circuit appointed attorney Paul Beers to represent Jordan. ECF No. 425.

would be admissible under the good faith exception to the exclusionary rule. Resp., ECF No. 199.

The court held a hearing on the motion to suppress and other pre-trial motions on February 5, 2020. ECF No. 211. Detective Flippin testified that through training and experience he had learned to keep affidavits in support of probable cause for a search warrant as brief as possible. Hr'g Tr., ECF No. 436 at 79–80. He testified that in addition to the conclusory accusations he made in the affidavits, he and other investigators also had interviewed people who made statements against their own penal interest and who reported receiving narcotics from Jordan. Id. at 80. Recorded conversations obtained by wiretap contained information that Flippin and other investigators believed to be "narcotics conversation." Id. at 81. In a subsequent request for extension of the search warrant relating to the same vehicles, Flippin added language related to the interviews he had conducted with people who had identified Jordan as their narcotics supplier. Id. at 83–85. Flippin stated that he could have added the same language to the first affidavit and that his failure to do so was an oversight. Id. at 85. When Flippin sought to extend the search warrants, he notified the Commonwealth Attorney's office and provided them with copies of the search warrants and affidavits to present to the circuit court judge, in accordance with state law, which provides that a circuit court can grant an extension of a search warrant. Id. at 90–92. Flippin also testified that when he sought extensions of the affidavits, he explained that multiple people with whom he had spoken had stated that Jordan supplied them with narcotics. Id. at 93.

The court found that the first two affidavits in support of the search warrants were sparse and insufficient to find probable cause because no corroborated facts were offered and

the affidavits stated only that Jordan was under investigation for narcotics trafficking. Mem. Op., ECF No. 222 at 5–6. However, the court went on to find that the evidence discovered pursuant to the search warrants was nevertheless admissible because the investigators reasonably relied on their validity, citing United States v. Leon, 468 U.S. 897 (1984), United States v. McKenzie-Gude, 671 F.3d 452, 460 (4th Cir. 2011); United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir. 1993), and United States v. Thomas, 908 F.3d 68, 74 (4th Cir. 2018).[2] The court found that the government demonstrated that probable cause for the search existed at the time of the application and that Flippin acted in good faith reliance on the search warrants. Flippin's failure to include the information that multiple interviews indicated that Jordan was involved in drug trafficking was an oversight and not the product of bad faith. In addition, the applications were approved by the state magistrate and extended by two state circuit court judges over several months. The court found that under these circumstances, the Leon good faith exception barred the application of the exclusionary rule in Jordan's case. Mem. Op., ECF No. 222 at 7–10.

On appeal, Jordan's appellate attorney, Paul Beers, addressed the denial of the motion to suppress. Beers argued that the court erred in relying upon McKenzie-Gude and Thomas. He argued that McKenzie-Gude and Thomas were wrongly decided and even if they accurately

---

[2] In Leon, 468 U.S. at 919, the Supreme Court held that evidence obtained by an officer who relied, in good faith, on a facially invalid search warrant is still admissible if the officer had an "objectively reasonable belief" that there was probable cause to execute the warrant. In McKenzie-Gude, 671 F.3d at 460, the Fourth Circuit held that in determining whether an officer acted in good faith, the court may consider information beyond the four corners of the application, such as the "uncontroverted facts" known to an officer that were "inadvertently not presented to the magistrate." In Lalor, 996 F.2d at 1583, the Fourth Circuit noted that two judicial officers had determined that the affidavit provided probable cause to search, which supported a finding that the Leon good faith exception applied. The Thomas court held that inadvertent omission of relevant facts does not cause the Leon good faith exception to be inapplicable. 908 F.3d at 74.

reflected Fourth Circuit precedent, that they were inapposite to Jordan's case. Beers' argument was detailed and he cited to the record and relevant case law. See Opening Brief, ECF No. 28 at 13–26 in United States v. Jordan, No. 21-4129 (4th Cir. filed Oct. 1, 2021). The Fourth Circuit affirmed the denial of the motion to suppress.

Jordan contends in this motion that Beers provided ineffective assistance because he did not argue that circumstances in this case prevented application of the Leon good faith exception. Mot., ECF No. 474 at 4. He asserts that this lack of argument by Beers meant that the court of appeals "was not called upon to determine whether circumstances existed to prevent application of the good faith exception." Id. at 8; see also Pet's Resp. to Mot. to Dism., ECF No. 497 at 5 ("Petitioner requested appellate counsel to argue on appeal that circumstances existed that prevented the application of the Leon Good Faith Exception and he failed to do so. The Court should grant this motion to permit Petitioner the opportunity of appellate review of this claim.")

However, Beers argued this exact point and the Fourth Circuit addressed the issue directly. Beers first argued that McKenzie-Gude and Thomas were wrongly decided in light of United States v. Lull, 824 F.3d 109, 118 and n.3 (4th Cir. 2016), pointing out that the Lull court held that in evaluating whether probable cause would have existed if statements omitted from an affidavit had been included, the court only considers the information actually presented to the magistrate and does not consider any other facts known to the officer but not presented to the magistrate. Opening Brief, ECF No. 28 at 17–18 in Jordan, No. 21-4129.

Beers next argued that Flippen's testimony did not cure his indisputably insufficient affidavit because the additional facts to which he testified at the hearing were that the

wiretapped conversations demonstrated what he believed to be conversations about narcotics but supplied no particularized facts about the number, contents, or dates of the recorded conversations. Beers argued that without those facts, and particularly the relevant dates, the recordings could not constitute probable cause for the affidavits. Id. at 21–23.

Beers also argued that even though Flippin testified that he interviewed several people who said they had either bought drugs from Jordan or had seen him distribute drugs to others, Flippin did not provide the dates on which the unnamed informants reportedly acted as participants or witnesses to Jordan's drug trafficking. Id. at 23–24. In addition, Flippin's testimony did not provide any information about the interviewees' reliability and veracity or their motives for cooperating with police. Id. at 24–25. Beers concluded that the government did not carry its burden under Leon to specify uncontroverted facts establishing probable cause which were known to Flippin but inadvertently omitted from his affidavit. "The Leon exception is inapplicable because Detective Flippin did not '… manifest objective good faith in relying on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Id. at 25.

In addressing the denial of the motion to suppress, the Fourth Circuit held the following:

> Here, the Government conceded that the contested warrant applications failed to establish probable cause. However, based on the officer's testimony regarding information known to him at the time of the applications, and the facts that a neutral magistrate granted the applications and two state court judges later renewed them, the district court determined that the officer had a reasonable belief that the resulting searches and gathering of evidence were lawful. We agree. The officer testified that he had recent information from several cooperating witnesses who provided information on Jordan's drug dealing activities and also

made statements against their own penal interest, information
that he inadvertently left out of the warrant applications.
Therefore, the officer's belief that he possessed probable cause
was not unreasonable.

United States v. Jordan, No. 21-4129, 2023 WL 1461995, at *2 (W.D. Va. Nov. 9, 2022) (per

curiam). Thus, Beers argued that the Leon good faith exception did not apply to Jordan's case,

but the Fourth Circuit addressed the issue and concluded otherwise.

To the extent Jordan is arguing that Beers provided ineffective assistance because he

did not cite the Fourth Circuit decision in United States v. Wilhelm, 80 F.3d 116 (4th Cir.

1996), his argument fails. See Pet's Resp. to Mot. to Dism., ECF No. 497 at 2–5. Effective

assistance of appellate counsel "does not require the presentation of all issues on appeal that

may have merit." Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir.2008). Generally, "'only

when ignored issues are clearly stronger than those presented'" should we find ineffective

assistance for failure to pursue claims on appeal. Smith, 528 U.S. at 288 (quoting Gray v. Greer,

800 F.2d 644, 646 (7th Cir.1986)).

The Wilhelm case is distinguishable from Jordan's case because there, the government

conceded that the only evidence presented to the state magistrate was the "bare bones

affidavit" and the affidavit was based on someone described as a "reliable source who is a

concerned citizen," and as "a mature person with personal connections to the suspects," who

had projected a "truthful demeanor." Wilhelm, 80 F.3d at 118, 121. The court declined to

apply the Leon good faith exception because the affidavit relied on an "unknown, unavailable

informant without significant corroboration." Id. at 123. In Jordan's case, in addition to the

bare bones affidavits, at the hearing, Flippin testified about additional corroborating evidence,

which the court found he had inadvertently omitted from the initial affidavits. Therefore, any

argument Beers might have presented based on <u>Wilhelm</u> would not have been "clearly stronger" than the arguments he made to the circuit court.

Beers' representation of Jordan on appeal was not defective, much less constitutionally defective. Accordingly, Jordan's claim that Beers provided ineffective assistance of counsel on appeal is **DISMISSED**.

### 2. Ineffective Assistance of Trial Counsel

### a. Failure to Request a <u>Franks</u> Hearing

Jordan argues that Nagy was ineffective for failing to request a <u>Franks</u> hearing to ask the court to find that Detective Flippin lied in the affidavits he used to obtain the GPS search warrants. In <u>Franks v. Delaware</u>, 438 U.S. 154, 155–56 (1978), the Supreme Court held the following:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

Jordan contends that Flippin lied in the affidavits about his suspicion that Raya was distributing drugs and that Nagy should have requested a <u>Franks</u> hearing to establish the Flippen was lying. Mot., ECF No. 474 at 9–10.

In support, Jordan offers his own statement made under penalty of perjury that he told Nagy that Raya had never sold drugs for him and that any statement by Flippin to the contrary was false. Affidavit of Monta Jordan, ECF No. 474-1 at 4–5. He also states that Nagy told him that in examining the case file he noticed no evidence that Raya was involved in Jordan's drug dealing activities. Jordan claims that Nagy said he had talked to the prosecutor who told him that Raya was under investigation and the government had not disclosed the evidence to Nagy for fear that Jordan would see it and notify Raya, but that charges against Raya were forthcoming. Id. at 7–8. Because Raya was never indicted in the drug conspiracy, Jordan asserts that the prosecutor lied about plans to charge Raya.

Jordan's statement about what the prosecutor told Nagy and what Nagy told Jordan is conclusory and hearsay within hearsay, making it insufficient to withstand the government's motion to dismiss or to entitle Jordan to an evidentiary hearing. "Airy generalities, conclusory assertions and hearsay statements do not suffice to stave off summary judgment or entitle a habeas petitioner to an evidentiary hearing, because none of these would be admissible evidence at an evidentiary hearing." United States v. Roane, 378 F.3d 382, at 401–02 (4th Cir. 2004) (quoting United States v. Aiello, 814 F.2d 109, 113 (2d Cir.1987)) (cleaned up).

In addition, as discussed above, Nagy challenged Flippin's affidavits on the basis that they did not contain sufficient facts to support a finding of probable cause to issue the search warrants. That Nagy chose a different strategy than the one preferred by Jordan does not mean that he provided ineffective assistance. Counsel provides reasonably effective assistance when he demonstrates legal competence, does relevant research, and raises important issues. Carthorne, 878 F.3d 458 at 465 (citing Strickland, 466 U.S. at 687–90). Nagy did that in this

16

case when he argued that the affidavits lacked probable cause. <u>See</u> Motion to Suppress Number 2, ECF No. 174; Hr'g Tr., ECF No. 436 at 64–100. "Attorneys need not raise every possible claim to meet the constitutional standard of effectiveness. They are permitted to set priorities, determine trial strategy, and press those claims with the greatest chances of success." <u>United States v. Mason</u>, 774 F.3d 824, 828 (4th Cir. 2014). Nagy's decision to not request a <u>Franks</u> hearing but to challenge the legal sufficiency of the affidavits was based on his analysis of the facts of Jordan's case and relevant law and was not ineffective assistance. Jordan cannot make out a claim of ineffective assistance based on Nagy's decision to not seek a <u>Franks</u> hearing and this claim is **DISMISSED**.

### b. Failure to Argue About the Monitoring of GPS devices on Jordan's Vehicles when they traveled outside the Commonwealth of Virginia

Jordan argues that Nagy provided ineffective assistance of counsel when he failed to argue that it was unlawful for law enforcement officers to track his movements via the GPS monitors on his vehicles when he traveled outside the Commonwealth. However, he cites no authority to support his argument that monitoring of his vehicle should have ceased when he crossed state lines. The Virginia statute that sets forth the requirements related to the application for and issuance of a search warrant for a tracking device and its installation and use provides the following:

> If the judicial officer finds, based on the affidavit submitted, that there is probable cause to believe that a crime has been committed, is being committed, or will be committed and that there is probable cause to believe the information likely to be obtained from the use of the tracking device will be evidence of the commission of such offense, the judicial officer shall issue a search warrant authorizing the use of the tracking device. The search warrant shall authorize the use of the tracking device from within the Commonwealth to track a person or property for a

> reasonable period of time, not to exceed 30 days from the issuance of the search warrant. The search warrant shall authorize the collection of the tracking data contained in or obtained from the tracking device but shall not authorize the interception of wire, electronic, or oral communications or the capture, collection, monitoring, or viewing of images.

Va. Code Ann. § 19.2-56.2.C.1. The statute states that the search warrant authorizes the use of the tracking device from within the Commonwealth, and the government argues that the language means the tracking is to be done from inside the Commonwealth but puts no geographic limitations or boundaries on information gathered when the tracked vehicle leaves the Commonwealth. Jordan argues that a common sense reading of the statute unquestionably means that a vehicle can only be tracked when it is inside the Commonwealth.

The only authority found related to this issue supports the reading that GPS surveillance may be carried out on a vehicle even when it travels out of the jurisdiction where the monitor was placed. In United States v. Douglas, No. 5:18CR14-8, 2020 WL 1902569 (N.D. W.Va. Jan. 23, 2020), report and recommendation adopted No. 5:18-CR-14-8, 2020 WL 729513 (N.D. W.Va. Feb. 13, 2020), a defendant moved to suppress evidence gathered at a traffic stop in Madison County, Ohio, based on evidence gleaned from a GPS tracking device that was attached to a vehicle pursuant to a search warrant issued in Franklin County, Ohio. The court denied the motion to suppress and observed the following:

> Defendant has not cited, and the undersigned is unaware of any case or statutory law which invalidates a tracking warrant issued by an Ohio Municipal Judge if the tracker and the vehicle to which it is attached leaves the county wherein the municipal judge presides. Moreover, as the Government points out, such an argument, when taken to its logical conclusion, would render a tracking warrant issued by a municipal judge essentially meaningless because each time the vehicle to which the tracker was attached entered a different jurisdiction (be it state or

federal), officers would have to apply for a new warrant. Given the obvious mobility of a vehicle, it is highly likely that officers would be unable to obtain authorization for such a tracking warrant before the vehicle at issue left the jurisdiction in which they were attempting to obtain the warrant and entered yet another jurisdiction. Imposing such a requirement upon officers would frustrate and indeed nullify the very purpose of a tracking warrant.

Douglas, 2020 WL 1902569 at *6.

Jordan attempts to distinguish Douglas from his case by saying that Douglas is limited to cases involving counties in the same state and should not be extended to evidence gathered by GPS devices that travel to a different state. However, he does not explain why such a distinction should be made and none is obvious to the court.

In any event, the issue before the court is not the determination of the legal parameters of the statute, but whether Nagy provided ineffective assistance when he did not base his motion to suppress on Jordan's reading of the statute. It is uncontested that no authority exists setting out geographic boundaries on a GPS tracking device, and in the absence of authority, Nagy was not ineffective for failing to raise such an argument. "A lawyer does not perform deficiently by failing to raise novel arguments that are unsupported by then-existing precedent." United States v. Morris, 917 F.3d 818, 823 (4th Cir. 2019). To be sure, when the law is unsettled, an attorney is obliged to make arguments that are sufficiently foreshadowed in existing case law, id. at 824, but Jordan has cited no authority, and the court found no authority, that would have obligated Nagy to move to suppress evidence gathered from Jordan's interstate travels.

Nor can Jordan show that he suffered prejudice from Nagy's failure to raise the issue as no evidence gathered from the GPS tracking devices was introduced at trial. The only

mention of the evidence gathered by the GPS tracking devices was brief and cursory. Agent Joe Crowder testified that officers "actually put GPS tracking devices on the vehicles that we identified that belonged to Mr. Jordan during the course of this investigation to track his movements." Trial Tr., ECF No. 430 at 102. Agent Crowder also testified that on August 2, 2017, "a Roanoke city officer [ ] served Mr. Jordan, [and] posted service of the executed search warrants that myself and other investigators did on GPS tracking devices. So those executed warrants and posted service was put at 2750 Creston Avenue, which is the residence of Monta Jordan and Amany Raya." Id. at 138, 140. Agent Crowder also described in a general fashion the dates and sequence that the tracking devices were placed on Jordan's vehicles. Id. at 231–34. In addition, as part of the application for an order authorizing the interception of wire communications ("Title III Wiretap"), Special Agent Charles Sanders stated that the GPS tracking units were ineffective in the investigation because Jordan and the target suspects frequently used rental vehicles to conduct their business and also because Jordan learned that the tracking units had been placed on his vehicles. Affidavit of Charles Sanders, ECF No. 495-13 at 48–49.

Jordan claims that the GPS tracking devices led to investigators identifying two co-defendants, Chelsea Fry and Amy Wheeling, who testified against him at trial, and to another government witness, Enrique Guillermo-Garzon.[3] Mot., ECF No. 474 at 14–15. However, Jordan stated in his motion that evidence from the GPS tracking devices led to law enforcement identifying Fry and Guillermo-Garzon when they interacted with Jordan in Roanoke, Virginia, and this is confirmed by police reports produced in discovery. Id. at 14;

---

[3] This last name is sometimes written as Guillermo-Garzon and sometimes as Garzon-Guillermon.

Report of Investigation prepared on October 10, 2018, ECF No. 495-20 at 1–2; Report of Investigation prepared on March 8, 2017, ECF No. 495-8.

Jordan also claims that law enforcement officers obtained location information from the tracking devices that revealed the residence of Wheeling, who was "not connected to Petitioner at this time." Mot., ECF No. 474. However, Wheeling testified that she lived in Roanoke, Virginia during the time she was interacting with Jordan, and there was no evidence presented that she and Jordan ever met up outside the Commonwealth. Trial Tr., ECF No. 437 at 170–240. Accordingly, it is clear from the record that law enforcement did not obtain information about the locations of Wheeling, Guillermo-Garzon, or Fry from any evidence gathered by the tracking devices when Jordan traveled out of the Commonwealth.

Jordan also stated that during April and May 2017, law enforcement monitored the GPS tracking devices when he traveled to North Carolina and Washington, D.C. and gathered evidence that was presented in the affidavit filed in support of the application for a Title III Wiretap. Mot., ECF No. 474 at 8–9. However, a review of the affidavit shows that Jordan is mistaken. There is no reference in the affidavit to information obtained from the GPS monitors about Jordan's whereabouts. Rather, information about Jordan's activities in North Carolina came from officers observing his interactions and transactions. See Affidavit of Charles Sanders, ECF No. 495-13 at 13, 15, 18, 19, 42. There are no references to Jordan's activities in the District of Columbia.

Accordingly, Jordan cannot make out an ineffective assistance of counsel claim based on Nagy's failure to argue that evidence gathered from outside the Commonwealth should have been suppressed or not relied upon in pre-trial investigations. Nagy's decision to not

pursue the argument was not deficient and even if it were, Jordan has failed to show any prejudice resulting from the decision. Therefore, this claim is **DISMISSED**.

### c. Failure to Argue Vindictive Prosecution

Jordan argues that his first trial counsel, Robert Rider, provided ineffective assistance of counsel because he failed to argue that Jordan was the victim of vindictive prosecution. This claim is based on Jordan's assertion that the government added two firearms charges to the second superseding indictment in response to Jordan having filed a misconduct complaint against investigators involved in his case. Mot., ECF No. 474 at 17–19. Jordan avers that on January 18, 2018, he sent a misconduct complaint to the Office of Inspector General identifying specific misconduct by officers investigating his case. Jordan Aff., ECF No. 474-1 at 2; Complaint, ECF No. 495-6. In April 2018, attorney Rider visited Jordan at the jail and Jordan told him about the misconduct complaint. Jordan Aff., ECF No. 474-1 at 2. According to Jordan, in early June 2018, Rider again saw Jordan at the jail and told him that he had "kicked the hornets' nest" and the entire United States Attorney's Office was angry with him. Id. at 3. Rider also told him that the prosecutor then handling his case had sent Rider a copy of the complaint. Id. On June 26, 2018, Jordan was charged with two firearm offenses. Id. Jordan contends that the filing of the firearm charges was done in retaliation for his having filed the complaint about misconduct.

Aside from his description of his conversations with Rider being hearsay within hearsay and his allegation wholly conclusory, Jordan's claim is moot. Under Article III of the Constitution, a federal court may only adjudicate actual, ongoing controversies. Honig v. Doe, 484 U.S. 305, 317 (1988). When a case or controversy no longer exists, the claim has become

22

moot. Jamison v. Rickard, No. 1:17-cv-03258, 2020 WL 4810252, at *2 (S.D.W.V. May 13, 2020). "A federal court lacks authority to render decisions on moot questions or make rulings that cannot affect the case before it." Alvarez v. Conley, 145 Fed. Appx. 428, 429 (4th Cir. 2005). "If developments occur during the course of a case which render the Court unable to grant a party the relief requested, the case must be dismissed as moot." Smithhart v. Gutierrez, No. CIV.A. 3:06-CV-11, 2007 WL 2897942, at *5 (N.D.W. Va. Oct. 2, 2007).

In Jordan's case, the firearm counts were dismissed, with Count Seven being dismissed by the government prior to trial and Count Six being dismissed by the court after trial. As there is no remedy available to Jordan regarding the firearms charges, his claim that Rider provided ineffective assistance of counsel when he failed to argue that Jordan was the subject of vindictive prosecution must be **DISMISSED** as moot.

## C. Government Misconduct

The remainder of Jordan's claims involve alleged misconduct by the government during the investigation and preparation of his case. As an initial matter, all the remaining claims are subject to dismissal because they were procedurally defaulted and therefore not cognizable on habeas review.

> In order to collaterally attack a conviction or sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack. See United States v. Frady, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); United States v. Maybeck, 23 F.3d 888, 891-92 (4th Cir. 1994). The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel. See Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). And, in order to demonstrate that a miscarriage of justice would result from the refusal of the

court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence. See id. at 496, 106 S.Ct. 2639.

United States v. Mikalajunas, 186 F.3d 490, 492–93 (4th Cir. 1999). See also United States v. McKinney, 60 F.4th 188, 193 (4th Cir. 2023) ("Two showings excuse a procedural default: a defendant's demonstration of 'either cause and actual prejudice or that he is actually innocent.'") (quoting Bousley v. United States, 523 U.S. 614, 622 (1998) (cleaned up)).

In response, Jordan asserts that for some of the claims, his cause for failing to assert the claim earlier was that his counsel was ineffective. However, his claims of ineffective assistance were dismissed above and none of them provide cause for his otherwise defaulted claims. Accordingly, his government misconduct claims are subject to dismissal because they are procedurally defaulted. In the alternative, the court addresses each claim on the merits.

### 1. Prosecutor's Misrepresentation Regarding Amany Raya

In assessing a claim of prosecutorial misconduct, the court must determine "whether the conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002) (quoting United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1995)). To state a claim for prosecutorial misconduct, the defendant must show that the prosecutor's conduct was improper and that the conduct "prejudicially affected his substantial rights so as to deprive him of a fair trial." Id. (citing United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)).

Jordan argues that the government engaged in misconduct when one of its prosecutors told Jordan's counsel that Jordan's girlfriend was going to be indicted in the conspiracy, which was untrue, and the false information caused his counsel to forgo a challenge to an affidavit used to obtain a search warrant. This assertion is related to Jordan's claim regarding the

affidavits prepared by law enforcement agents to obtain the GPS search warrants that in turn were used to authorize tracking devices to be placed on Jordan's vehicles.

In the affidavits, set forth above, Flippin asserted that investigation and post-Miranda interviews showed that Raya distributed drugs obtained from Jordan and that assertion was one of the bases offered in support of the search warrants. ECF No. 471 at 33, 38. However, Jordan claims that Nagy's review of the other evidence did not support the accusations regarding Raya, and Jordan assured Nagy that Raya had not played a role in the drug distribution conspiracy. Jordan Aff., ECF No. 474-1 at 4–5, 7. Jordan continues that Nagy asked the prosecutor about it, who told him that Raya was the subject on an ongoing investigation and would be indicted as part of the conspiracy. Id. at 7–8. Jordan asserts that the prosecutor's assurance of an upcoming indictment was a lie and that if she had not made that assurance, Nagy would have challenged the affidavits on the basis that they contained a lie, i.e., that Raya was involved in the conspiracy. He argues that were it not for the prosecutor's lack of candor, Nagy "would have pursued a Franks hearing, would have been successful, and evidence obtained as a result excluded from trial." Mot., ECF No. 474 at 23–24.

This claim by Jordan once again is based on hearsay within hearsay and offers nothing more than a conclusory allegation that the prosecutor lied about plans to indict Raya.[4] As such,

---

[4] It bears noting that while Raya was not indicted as part of the Jordan drug distribution conspiracy, she was indicted and convicted on other charges, although the convictions ultimately were vacated. On January 18, 2019, Raya was indicted on one count of providing and attempting to provide marijuana to Jordan who was incarcerated in the Roanoke City Jail, in violation of 18 U.S.C. §§ 1791(a)(1) and (d)(1)(B) (Count One), and one count of possessing with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D) (Count Two). ECF No. 1 in United States v. Raya, No. 7:19-cr-9 (W.D. Va. filed Jan. 18, 2019). On June 6, 2019, Raya was charged in a superseding indictment with the same two counts, plus with conspiring to provide and attempt to provide marijuana, a mobile phone, and a watch to Jordan in the jail in violation of 18 U.S.C. § 1791(a)(1), (d)(1)(B), and (d)(1)(F), all in violation of 18 U.S.C. § 371 (Count Three); using the mail to facilitate a felony, in violation of 21 U.S.C. § 843(b) (Count Four); and two counts of attempting to procure and obtain naturalization and citizenship for herself to which she was not entitled in violation of 18 U.S.C. § 1425(b)

it is insufficient to establish that the government engaged in improper conduct, Roane, 378 F.3d at 401–02, and fails to establish that Jordan's conviction is constitutionally infirm. Accordingly, this claim is **DISMISSED**.

## 2. Unavailable Witness

Jordan contends that the government engaged in misconduct when the prosecutor told defense counsel that a witness Jordan had subpoenaed, Josh Chandler, could not attend an evidentiary hearing because he was on military deployment when the truth was that although Chandler was out of the country, the government did not know where he was or what he was doing. On February 5, 2020, the court held a hearing on the motion to suppress and other motions and heard testimony about an allegation that Chandler, an officer involved in the investigation of the drug conspiracy, had engaged in an inappropriate relationship with a woman, Eugenia Cancino, who was a fugitive at the time the two were in a relationship, and who also was a "female companion" of Jordan. Hr'g Tr., ECF No. 436 at 13–14; Mot., ECF No. 474 at 22. Jordan wanted the opportunity to cross-examine Chandler about his relationship with Cancino based on allegations of misconduct and other issues related to Giglio.[5] Id. at 15–16.[6]

---

(Counts Five and Six). Id. at ECF No. 54. On January 7, 2020, the government moved to dismiss Counts Two and Four of the superseding indictment and the court granted the motion. ECF Nos. 135, 137. On January 17, 2020, a jury returned a verdict of "not guilty" on Count One and "guilty" on Counts Three, Five, and Six. Id. at ECF No. 154. On May 14, 2021, the government moved to dismiss all charges related to Raya following a revelation that documents that should have been provided to her in discovery had not been provided. Id. at 231. The court granted the motion on May 17, 2021. Id. at 233.

[5] In Giglio v. United States, 405 U.S. 150 (1972), the Supreme Court held that the government must disclose impeachment evidence in a timely manner.

[6] Jordan also has long maintained that Chandler and two other law enforcement officers burglarized his home on March 6, 2017. This allegation was addressed multiple times in this criminal matter as well as in a civil lawsuit filed by Jordan and is discussed more fully below.

Jordan's counsel sought and was granted a motion for issuance of a subpoena for Chandler and two other witnesses to appear and testify at the hearing. ECF Nos. 207, 208. On the day of the hearing, prosecutor Anthony Giorno told the court that Chandler was out of the country. Hr'g Tr., ECF No. 436 at 21. In response to a question about whether Chandler was serving a military obligation, Giorno told the court that he did not know the circumstances of Chandler's absence, but that he was "somewhere out of the country for some reason." The prosecutor also told the court that the government had not planned on calling Chandler to testify at trial because his role in the case had been minimal. Id.

Jordan claims that prior to the hearing, a different prosecutor, Kari Munro, told Nagy that Chandler would not be available because of a military deployment. Jordan then asserts, without any foundation, that Chandler, "upon finding out by AUSA Munro that the defense would be calling him as a material witness to misconduct," left the country. Jordan claims that Munro lacked candor when she advised Nagy that Chandler was unavailable because of a military deployment. Mot., ECF No. 474 at 20, 22.

The evidence does not support Jordan's claim. Jordan submitted a copy of an email exchange between himself and Nagy. Jordan told Nagy that in January 2020, Nagy had visited him at the jail to discuss the February 5, 2020, hearing. Email from Jordan to Nagy dated Feb. 10, 2022, ECF No. 474-1 at 48. Jordan summarized that Nagy told him that Nagy had contacted AUSA Munro to request that the government produce three law enforcement officers, including Chandler, for the hearing, and had also filed a request that subpoenas be issued for the officers. Id. Jordan added:

> You were of the impression that these officer's [sic] would be
> available and subsequently only found out on the morning of the

hearing that officer Chandler had left the country. This is what I have noted from our conversation and I just wanted to make sure this is an accurate account of what transpired regarding this situation and would appreciate it greatly if you could correct me if I'm mistaken?

Id. at 48–49.

In response, Nagy told Jordan that he did not recall whether Munro had told him specifically that Chandler would be at the hearing. Email from Nagy to Jordan dated Feb. 10, 2022, ECF No. 474-1 at 47. Nagy added that he was not aware of Chandler's absence or inability to appear until the 12 hours directly before the hearing. He could not remember whether Munro told him Chandler would not be attending the hearing the night before the hearing or the morning of the hearing, but was confident he did not learn of Chandler's absence until shortly before the hearing. Nagy concluded, "I did file a motion and issue a request for a subpoena to all three of the individuals. To the best of my knowledge, Chandler was not served due to his being 'deployed.'" Id.

Jordan also attached screen shots of undated texts with someone named Ashley Hickey, who, at Jordan's request, asked her mother if Chandler had had gone overseas "around February of last year." Her mother responded that Chandler had done so "last year" around "the beginning of the year" and that he was "working in Afghanistan but wasn't there for very long." ECF No. 474-1 at 54–58.

None of the evidence submitted by Jordan supports his claim that Chandler left the country to avoid testifying or that prosecutor Munro lied to Nagy or otherwise engaged in misconduct. Moreover, even if Chandler left the country rather than testify about alleged misconduct and even if the prosecutor lied about his reason for leaving the country, his

absence from the February 5, 2020, pre-trial hearing did not affect Jordan's case. Neither Cancino nor Chandler were called to testify at trial and Jordan has pointed to nothing to indicate that the alleged misrepresentation by Munro "prejudicially affected his substantial rights so as to deprive him of a fair trial." Scheetz, 293 F.3d at 185. Accordingly, this claim is **DISMISSED**.

### 3. Vindictive Prosecution

Jordan claims that the government engaged in vindictive prosecution when it charged him in Count Six of the third superseding indictment with a firearm offense in violation of 18 U.S.C. §§ 924(c) and 2. As discussed above in the context of Jordan's ineffective assistance of counsel claim based on the same circumstances, this claim became moot when Counts Six and Seven were dismissed. Accordingly, this claim is **DISMISSED**.

### 4. Monitoring of Vehicle Outside the Commonwealth of Virginia

Jordan asserts that investigators unlawfully monitored his vehicle when he traveled outside the Commonwealth of Virginia. Jordan's claim essentially is that the evidence of his travels outside the Commonwealth should have been suppressed because the warrant did allow for the gathering of that evidence. However, as set forth above in the context of Jordan's ineffective assistance of counsel claim, he cannot show either that the monitoring of his vehicle outside the Commonwealth was improper or that evidence gathered by the monitoring 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Scheetz, 293 F.3d at 185. The evidence gathered by the GPS monitor related to Jordan's interstate travels was not introduced at trial, and although Jordan posited that information gathered led to law enforcement identifying three people who testified against him at trial, the

record shows that all three people were located in Roanoke, Virginia, and met Jordan in Roanoke. In addition, none of the evidence gathered was cited in the affidavit in support of the application for the Title III Wiretap. Accordingly, this claim is **DISMISSED**.

### 5. Drug Enforcement Agency Administrative Subpoena

Jordan claims that an administrative subpoena issued to a telephone service provider for records related Jordan's phone number was improperly signed by a local law enforcement officer rather than by a federal Drug Enforcement Agency (DEA) agent and as a result, was unlawful and violated his due process rights under the Fifth Amendment. He claims that the evidence garnered by the warrant led to the start of the investigation against him. Mot., ECF No. 474 at 29–31.

Detective Ryan Sloan is a Roanoke City police officer assigned to the DEA as a task force officer and was involved in the investigation of Jordan. Hr'g Tr., ECF No. 373 at 127. On December 28, 2016, Sloan prepared an application for an administrative subpoena to monitor a phone number alleged to belong to Jordan. ECF No. 346-5 at 1. The only copy of the subpoena available is incomplete and not signed. Sent. Hr'g. Tr., ECF No. 404 at 107–08; Mot., 474-1 at 74–75. Sloan testified under oath at the time Jordan was sentenced that his supervisor, Rob Johnson, with the DEA, would have signed the subpoena, because Sloan did not have authority to sign it. Sent. Hr'g. Tr., ECF Nos. 404 at 108.

Jordan claims, without support, that Sloan took it upon himself to sign the administrative subpoena and lied under oath when questioned about it. Mot., ECF No. 474 at 30. He then claims that his due process rights were violated by Sloan's "blatant conduct that erodes the fair administration of justice." Id. at 31. In response to the government's motion

to dismiss, Jordan states that given the lack of a copy of the signed subpoena in the record, a "better explanation" is that Sloan took it upon himself to sign the DEA subpoena while his supervisor was gone during the holidays. Resp., ECF No. 497 at 19–20.

Again, Jordan's conclusory allegation is insufficient to withstand a motion to dismiss a § 2255 motion. Roane, 378 F.3d at 401–02. Detective Sloan swore under oath that he did not sign the subpoena because he did not have authority to do so and that he gave it to his supervisor, who did have authority, to sign. Jordan offers nothing in response but speculation with no basis in fact that Sloan signed the subpoena and then lied about it. As such, his claim fails.

In addition, Jordan argues that even if Johnson signed the subpoena, it was "issued" at Sloan's request, and therefore had no legal authority. He claims that only a DEA officer can issue a subpoena and Johnson's signature could not validate an otherwise invalid subpoena. Resp., ECF No. 497 at 18–19. There is no basis for this claim in the record and Jordan's unsubstantiated allegation that Johnson did not "issue" the subpoena provides no basis for relief. Accordingly, this claim is **DISMISSED**.

### (6) Allegation the Law Enforcement Officers Deleted Text Messages

Someone broke into Jordan's home on March 6, 2017, and stole money and jewelry. Jordan Aff., ECF No. 474-1 at 4–5. Video from a pole camera placed at Jordan's residence for surveillance purposes captured images of two people outside Jordan's house on the day of the break-in. Hr'g Tr., ECF No. 436 at 93–94. Since the break-in occurred, Jordan has asserted that the burglars were law enforcement officers who broke down his door and entered his home hoping to find drugs as part of their investigation into his activities. Jordan Aff., ECF

No. 474-1 at 5–6. Prior to trial, Jordan wanted to raise a defense of "outrageous misconduct" on the part of law enforcement, based on his belief that police officers had burglarized his home. See Am. Mot. for Early Discovery, ECF No. 191 ¶ 5 ("That upon information provided by the Defendant, there is reason to believe that the investigators who participated in this matter were involved in "outrageous misconduct" that included but was not limited to the investigators (i) burglarizing the Defendant's home, …").

The issue of the break-in was raised in pre-trial and post-trial motions and hearings, and law enforcement officers consistently testified under oath that they did not burglarize Jordan's home. Jordan also testified that he had seen the video from the pole camera and could not identify the men in the video, other than their being white. See Hr'g Tr. from Feb. 5, 2020, ECF No. 436 at 95–97; Hr'g Tr. from February 18, 2020, ECF No. 250 at 6–11, 15–17, 21–28; Hr'g. Tr. from Dec. 1, 2020, ECF No. 373 at 200–213, 235–237, 252–254; Sent. Hr'g Tr. from March 9, 2021, ECF No. 414 at 66–75, 96–102, 111, 135–138. The court viewed the video from the pole camera from March 6, 2017. Id. at 135–137.

The court found that no evidence supported Jordan's allegation that the police burglarized his home. Hrg. Tr. from Feb. 8, 2021, ECF No. 438 at 43, 49–50; Order, ECF No. 224 ("The court finds that no proof has been provided to support the allegations and there is no basis for a reasonable jury to find the fact of 'outrageous conduct' by a preponderance of the evidence."); Order, ECF No. 214 (concluding that documents that supported Jordan's theory that officers broke into his home would be discoverable and the government had a continuing obligation to produce it, but the government represented that no such evidence existed); Mem. Op., ECF No. 355 at 24 ("Jordan has failed to produce any evidence, though

he has been afforded several opportunities, to substantiate his claim that the burglary was perpetrated by law enforcement. Absent sufficient evidence to make such a claim plausible, the court finds Jordan's allegations of government misconduct remain mere speculation.")

Jordan also filed a civil lawsuit, alleging violation of his civil rights by law enforcement officers based on his belief that they burglarized his home. See Jordan v. Flippin, No. 7:19-cv-214 (W.D. Va. filed Mar. 7, 2019) (Jones, J.). The court dismissed the lawsuit for failure to state a claim, finding that Jordan was asking the court to accept as fact his mere suspicion that the officers committed the burglary and drawing inferences from other facts alleged regarding people with whom he interacted in at his home and in his yard prior to March 6, 2017. Id., 2020 WL 1076048 at *5.

In this § 2255 motion, Jordan argues that on March 6, 2017, the day of the break-in, he had texted co-defendant Chelsea Fry and told her that the police had broken into his home and stolen his money. Jordan Aff., ECF No. 274-1 at 7. That same day, officers interviewed Fry and she gave consent for them to download the contents of her cell phone. The officers did so and returned Fry's phone to her. Mot., ECF No. 474 at 32–33; Resp., ECF No. 486 at 46. The prosecution provided the texts to Jordan and his attorney as part of discovery. Jordan Aff., ECF No. 474-1 at 7; Resp., ECF No. 486 at 46.

Jordan avers that the policed deleted "five hours" of text messages from the text exchanges provided by the prosecution and that the deleted texts showed that he told Chelsea Fry that he believed the police broke into his home. Jordan Aff., ECF No. 471-1 at 7. He claims that the deletion of the texts was misconduct on the part of the government. One of the officers involved in interviewing Fry provided a sworn declaration in which he denied that

33

officers deleted any text messages from the data gathered from Fry's phone, and in particular, did not delete text messages between Jordan and Fry from March 6, 2017, or any other date. Decl. of Ryan Sloan, ECF No. 495-18 at 2.

Jordan's allegation about the deletion of text messages is wholly conclusory and speculative and therefore insufficient to withstand the government's motion to dismiss. In addition, even if police did delete the texts, it would have no effect on the outcome of Jordan's case. It is uncontested that Jordan believes that police burglarized his home and showing that he told Fry on the day of the burglary that he believed the police were responsible is not evidence that the police were involved—it is just more speculation on his part. Accordingly, this claim is **DISMISSED**.

### D. Request to Conduct Discovery and for an Evidentiary Hearing

Jordan has filed a motion for an evidentiary hearing, a motion for leave to file a amended motion for discovery, and a motion for leave to file a motion to expand the record. ECF Nos. 496, 500. 501. The motion for a hearing is **DENIED** because an evidentiary hearing is unnecessary to resolve the issues in this case as it is clear that Jordan is not entitled to relief. See 28 U.S.C. § 2255(b) (providing that "if the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court may deny the petition without holding a hearing); Rule 4(b), Rules Governing Section 2255 Proceedings ("If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.")

Regarding discovery, upon a showing of good cause, the court may authorize a party to conduct discovery. Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts; Roane, 378 F.3d at 402–03. Discovery is warranted where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief. Bracy v. Gramley, 520 U.S. 899, 908–09 (1997). Discovery requests may not be so broad and baseless as to constitute a "fishing expedition." United States v. Jose, Crim. Case No. DKC 11-0288, 2021 WL 2260377 (D. Md. June 3, 2021) (citing United States v. Wilson, 901 F.2d 378, 381 (4th Cir. 1990)). Nor does good cause exist if a defendant premises a discovery request on a claim that fails as a matter of law. Id. (citing Thomas v. Taylor, 170 F.3d 466, 474 (4th Cir. 1999)).

The court has reviewed Jordan's requests and determined that he has not shown good cause for additional discovery. The specific requests and reasons for the denial are set forth below:

(1) He requests materials related to his claim of vindictive prosecution. However, the court dismissed this claim as moot as a matter of law, precluding additional discovery.

(2) He requests the "pen register/trap and trace application" and the "various search warrants sought by DEA Agent Charles Sanders" for Jordan's telephone number to prove "the evidence gleaned from the government's improper actions and the overall candor/integrity of the underlying proceedings." Mot., ECF No. 500 at 3–4. The court previously found that the prosecution turned over all relevant discovery material in this case and Jordan is not entitled to conduct broad and baseless discovery as part of a fishing expedition to support his speculative allegations about government misconduct.

(3) He requests GPS and surveillance materials for his vehicles that were the subject of surveillance "to identify to the court that meaningful evidence was indeed gathered by law enforcement." The court first notes that the government provided a great deal of evidence gathered by the GPS monitors on Jordan's vehicles. See ECF No. 495-2 at 14–30; ECF No. 495-3 at 14–21; and ECF No. 495-5 at 14–23. In addition, the court determined that evidence from the surveillance efforts was not gathered in violation of Jordan's constitutional rights and was not presented as evidence at trial. Accordingly, the evidence of GPS and surveillance materials would not entitle Jordan to relief in this § 2255 motion and are not subject to discovery.

(4) He requests copies of text messages he claims were deleted from Fry's cell phone where he texted her that he believed police broke into his house on March 6, 2017. As set forth above, this claim fails as a matter of law and additional discovery is not warranted.

(5) He requests video from the pole camera installed to surveil his house between the dates of February 21, 2017, and March 21, 2017, to prove that officers burglarized his home on March 6, 2017. The video from the day of the break-in was viewed by Jordan, his attorneys, and the court, all of whom were unable to identify the people on his property as law enforcement officers. The evidence requested would not entitle Jordan to relief on his § 2255 motion.

(6) He requests materials related to the August 2017 Aimee Ray interview by Detective Chandler and Aimee Ray's January 18, 2018, testimony to the grand jury. Jordan posits that Ray's testimony led to his indictment on methamphetamine charges and he hypothesizes that comparing the notes from Ray's 2017 interview with her grand jury testimony will show how

36

the absence of Chandler's testimony at the February 5, 2020, evidentiary hearing "prejudicially affected petitioner and denied him a fair trial." Mot., ECF No. 500 at 6–7. Jordan's request for discovery to support his speculative allegation regarding Chandler's testimony is overly broad and baseless.

(7) He requests "[e]mails/correspondence and notes" between his attorney and prosecutors, to support his various allegations regarding the 2016 DEA subpoena, the government's assertion to Nagy that it was going to indict Raya as part of the conspiracy, and the non-appearance of Chandler at the February 5, 2020, hearing. He claims that the requested material is needed to show the government engaged in prejudicial misconduct undermining the integrity of the proceedings. However, all these claims were dismissed because Jordan's allegations regarding each of them was based solely on speculation, or because the actions by law enforcement did not undermine confidence in his conviction, or both. Jordan now seeks to conduct a fishing expedition in the hopes of finding evidence to support his claims, which is insufficient to show good cause to conduct discovery.

(8) He requests evidence gathered by the United States Attorney's Office regarding the alleged police burglary of his home on March 6, 2017. As discussed above, this claim was the subject of several discovery requests and hearings, as well as a civil lawsuit, and the court found no evidence to support Jordan's allegations. His desire to continue searching for evidence to support his entirely speculative claim provides no basis for additional discovery.

(9) He requests a verbatim transcript of the October 3, 2018, interview with Guillermo-Garzon to prove that he told Guillermo-Garzon on March 6, 2017, that he believed the police had broken into his home. Even if in the interview Guillermo-Garzon told police that Jordan

told him that the police had burglarized his home, the statement would not be evidence that the police burglarized Jordan's home and is irrelevant to the resolution of his § 2255 motion.

Since before his jury trial, Jordan has claimed that police burglarized his home; the out-of-state GPS surveillance was illegal; the administrative subpoena for his phone records was improperly signed; and that Chandler's absence at the February 2020 evidentiary hearing was procured by the United States. These topics are not new, and many were the subject of motions and hearings connected with the trial. The court does not believe that additional discovery and a hearing would shed any light on Jordan's oft-repeated complaints about his prosecution. For these reasons, Jordan's motions for leave to file an amended motion for discovery and to expand the record are **DENIED**.

## III.

Based on the foregoing, the court **DENIES** Jordan's petition for relief under § 2255, ECF No. 474, and **GRANTS** the government's motion to dismiss, ECF No. 486. The court also **DENIES** Jordan's motion for an evidentiary hearing, ECF No. 496, his motion for leave to file an amended motion for discovery, ECF No. 500, and his motion to expand the record, ECF No. 501. Because Jordan has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c) and Slack v. McDaniel, 529 U.S. 473, 484 (2000), a certificate of appealability is **DENIED**.

An appropriate Order will be entered.

Entered: *May 7, 2025*

Michael F. Urbanski
Senior United States District Judge